Moss, Judge,
delivered the opinion of the court:
On October 29, 1917, plaintiff, the Austin Company, entered into a written contract with the Government by which *514 it agreed to furnish the material and construct for the Government at Greenbury Neck, Maryland, the structural steel framework for four 600-foot steel radio towers, for which plaintiff was to receive the sum of $241 per ton. The eighth clause of said contract contained the following provision:
“ The structural steel to be furnished under this contract shall be taken from stock and shall conform to the requirements of the Manufacturers’ Standard Specification for such steel, and that in lieu of the tests specified, there will be accepted a certificate to the effect that such steel meets the above requirements.”
A certain portion of the steel which entered into the construction of the towers was procured by plaintiff’s subcontractor, Hamilton Bridge Works Company, from the mills of the Jones & Laughlin Steel Company, and defendant in its final payment to plaintiff on account of the contract deducted from the full contract price $21,480, and still retains same, as representing the difference between the contract price per ton on 537 tons of steel and the lower price for such steel secured at the mill. This is an action for the 'recovery of said $21,480.
The contract was prepared by an' assistant in the contract section, Bureau of Yards and Docks, Navy Department, several days prior to the date of its execution. Prior to the signing of the, contract plaintiff informed the Bureau of Yards and Docks that certain steel members required in the' construction of said towers were not obtainable in stock .in any of the warehouses, and that in order to secure this class of material plaintiff’s subcontractor had placed an order with the Jones & Laughlin Steel Company for 537 tons of the sizes and shapes required. The production of steel throughout the country was, at that time, under the control of the War Industries Board, and it was necessary, in this instance, to procure priority certificates from a certain committee of said board, as authority for the Jones & Laughlin Steel Company to comply with said order. Negotiations between plaintiff and representatives of the Bureau of Yards and Docks, extending over a period of several days, resulted in securing the necessary priority certificates, and plaintiff immediately entered upon the perfor- *515 manee of the contract, using, in part, the mill steel obtained by its subcontractor from the Jones & Laughlin steel mills. The officials of the Government, who were in direct charge of the transaction, and who made the contract with plaintiff, not only knew that steel entering into the construction of the towers was being furnished from the mills, but said officials actually obtained the priority certificates, without which plaintiff could not have secured such mill steel. At no time during these negotiations was the question of difference in price mentioned. However, on December 28, 1917, the Chief of the Bureau of Yards and Docks addressed a letter to plaintiff in which it was stated: “ This contract was awarded you with the understanding that the structural steel would be taken from stock. The bureau is informed that approximately 355 tons of structural shapes and 165 tons of grooved rolled plates are being furnished you from the mill at the special Government prices of 3.000 and 3.250 per pound base f. o. b. Pittsburgh, for shapes and plates, respectively. On account of this fact the bureau will claim a credit in the final adjustment of this contract price.” It is worthy of notice that this letter was signed by G. B. Kurrie, commander in charge of the construction division of the Bureau of Yards and Docks, and the official who personally requested the War Industries Board to issue the priority certificates for plaintiff’s use, and who had full knowledge, at all times, that a certain portion of the structural steel was coming' from the mills. It should be mentioned'in this connection that plaintiff’s assertion that the structural steel in question could not be obtained in stock was accepted as true by defendant’s representatives. The record contains no positive evidence that such steel could be had from stock. It was an emergency project, which called for prompt and speedy performance, and both plaintiff and defendant’s representatives were active in securing the priority certificates which would enable the steel mills to furnish the necessary material. The only change from the written contract was in regard to the use of steel from the mills, instead of from stock. The Government and the plaintiff were in definite agreement on this point. The contract, however, as finally signed by the parties, *516 retained the original requirement. It does not reflect the true agreement between the parties.
The authority of the court to reform a written instrument in circumstances such as exist in the present case is well settled. Hearne v. Marine Insurance Co., 20 Wall. 488; Ackerlind v. United States, 240 17. S. 531. If the contract in this case had been modified in terms to conform to the true agreement between plaintiff and defendant’s representatives, it is safe to assume that there would have been no lawsuit between these parties. Plaintiff’s rights herein are to be determined as if the contract had been so modified.
It should be noted that the steel furnished by the Jones & Laughlin mills, and used in the construction of the tower's, was in all respects the same in quality and kind as the steel furnished from stock; and it might also be mentioned that plaintiff obtained no credit or refund by reason of the difference between the price of the mill steel and the steel from stock.
Plaintiff is entitled to recover the amount sued for, and it is so ordered.
Graham, Judge; Booth, Judge; and Campbell, Chief Justice, concur.